*Blood, et al. v. Stoneridge at Fountain Green Homeowners Ass'n, Inc.*, No. 0476, September Term, 2018. Opinion by Nazarian, J.

**REAL PROPERTY – CONSTRUCTION AND OPERATION – COVENANTS AS TO USE OF REAL PROPERTY**

A decision under an architectural control covenant to prohibit front roof solar panels is not an "unreasonable limitation" under Real Property § 2-119(b)(2), where homeowners failed to seek and obtain required approval from homeowners' association before installing the system on front and back roofs and where the homeowners' association only required removal of front roof panels and allowed solar panels on back roof to remain in place.

Circuit Court for Harford County
Case No. 12-C-16-003324

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 0476

September Term, 2018

———————————————————————

JONATHAN BLOOD, ET AL.

v.

STONERIDGE AT FOUNTAIN GREEN
HOMEOWNERS ASSOCIATION, INC.

———————————————————————

Fader, C.J.,
Nazarian,
Zarnoch, Robert A.
  (Senior Judge, Specially Assigned),

JJ.

———————————————————————

Opinion by Nazarian, J.

———————————————————————

Filed:  August 29, 2019

* Judge Dan Friedman did not participate in the Court's decision to report this opinion pursuant to Md. Rule 8-605.1.

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Don't let the sun go down on me
Although I search myself, it's always someone else I see
I'd just allow a fragment of your life to wander free
But losin' everything is like the sun goin' down on me[1]

This case is the first test of a relatively new statute, Maryland Code (1974, 2015 Repl. Vol.), § 2-119(b) of the Real Property ("RP") Article, and the extent to which the pro-solar energy policy it embodies limits the normally broad power of homeowners' associations to enforce aesthetic uniformity. Jonathan and Megan Blood, homeowners in a development called Stoneridge at Fountain Green, installed solar panels on the roof of their home. Unfortunately, they failed to get approval from the Stoneridge at Fountain Green Homeowners Association, Inc. (the "Association") before beginning installation. The Bloods later asked for the Association's approval, which was denied, then they ignored the Association's order directing them to remove the panels from the front roof of the house.

The Association brought suit in the Circuit Court for Harford County, seeking a declaration that the Bloods were in violation of the Association's declaration of covenants and an injunction directing them to remove the panels from the front roof of their house. After a short trial, on largely stipulated facts, the circuit court entered judgment for the Association. On appeal, the Bloods argue that the Association's order places an unreasonable limitation on their solar installation in violation of RP § 2-119(b) and that the Association unreasonably withheld its consent to the system they installed. As we explain, the notion of reasonableness the Bloods ask us to adopt here misconstrues the text and

---

[1] ELTON JOHN & BERNIE TAUPIN, *Don't Let the Sun Go Down on Me*, *on* CARIBOU (MCA Records 1974).

purpose of the statute. We hold that the limitation here was reasonable and enforced reasonably and affirm.

## I. BACKGROUND

In April 2015, the Bloods purchased a single-family home in a subdivision in Bel Air. The property was part of a development called Stoneridge at Fountain Green and subject to a Declaration of Covenants, Conditions, and Restrictions (the "Declaration"). Among other things, Article V of the Declaration required the Bloods to seek approval by the Association's Board of Directors or architectural review committee before adding to, changing, or altering the property:

> No building, fence, wall or other structure shall be commenced, erected or maintained upon the Property, nor shall any exterior addition to or change or alteration therein be made (including, without limitation, any structure which impedes or impairs mowing or lawn maintenance) until the plans and specification showing the nature, kind, shape, height, materials and location of the same shall have been submitted to and approved in writing as to harmony of external design and location in relation to surrounding structures and topography by the Board of Directors of the Association or by an architectural committee composed of three (3) or more representatives appointed by the Board, which approval shall not be unreasonably withheld . . . .

A few months after moving in, on June 19, 2015, the Bloods entered an agreement with a company called SolarGaines to install a solar collection system on their roof. The system included fifteen solar panels on the front roof of the house and thirty-three solar panels on the rear roof, along with the equipment, such as an inverter and net meter, needed to connect the system to the local electric company's distribution system. The installation was completed approximately two months later.

2

The Bloods don't dispute that the Declaration required them to seek approval before installing the system or that they failed to file an application for approval with the Association's architectural committee until August 6, 2015, when installation was nearly complete. The committee denied the Bloods' application on August 27, 2015, and the Bloods didn't appeal the decision to the Association's Board of Directors at that point or take the solar system down.

On May 4, 2016, the Association sent the Bloods a letter notifying them that their solar array violated the Declaration because it lacked "the mandatory written approval [of the committee] per Article V [] of the Declaration for Stone Ridge at Fountain Green." The letter directed the Bloods to "remove the solar panels within 30 days of the date of this letter;" the letter didn't qualify this direction or limit it to the panels on the front roof, but the "Subject" line of the letter said, "Solar Panels Removal on Front of House." After receiving the letter, the Bloods appealed the architectural committee's August 2015 decision to the Association's Board of Directors, and the Board denied the appeal on July 25, 2016.

The Bloods still didn't remove the solar panels from their front roof, so on December 14, 2016, the Association filed a two-count complaint in the Circuit Court of Harford County. Count 1 sought a declaratory judgment stating that the Bloods were in violation of the Declaration. Count 2 sought an injunction "DIRECTING the [Bloods] to dismantle and disassemble their solar system and to remove the same from the front roof" of the house. The complaint doesn't quote from the Association's May 4, 2016 violation letter, but in paragraph 20, characterizes that letter as directing the Bloods to remove the

3

solar panels only from the front roof. Similarly, the complaint alleges in paragraph 21 that "[n]otwithstanding the second notification the [Bloods] failed to remove the solar system from the *front* roof and the solar system is still attached to the *front* roof of the [Bloods'] residence." (Emphasis added.) The Association also filed a motion for summary judgment alongside the complaint, which contended that the material facts were undisputed—the text of the Declaration required approval and the solar system remained on the Bloods' roof without it. For that reason, the Association argued it was entitled to judgment as a matter of law.

The Bloods answered and opposed the Association's motion. Although they claimed that material facts were in dispute, they didn't identify any. They emphasized, however (and correctly), that the Association hadn't stated any reasons for denying their application, and argued that requiring them to remove the solar panels from their front roof imposed an unreasonable limitation on solar installations that violated RP § 2-119(b). That statute limits restrictions on land use that interfere unreasonably with solar energy installations, and defines "unreasonable limitations" as restrictions that increase the cost or decrease the efficiency of the system significantly:

> (b)(1) A restriction on use regarding land use may not impose or act to impose unreasonable limitations on the installation of a solar collector system on the roof or exterior walls of improvements, provided that the property owner owns or has the right to exclusive use of the roof or exterior walls.
>
> (2) For purposes of paragraph (1) of this subsection, an unreasonable limitation includes a limitation that:
>
> (i) Significantly increases the cost of the solar collector system; or

4

(ii) Significantly decreases the efficiency of the solar collector system.

The court held a trial on January 22, 2018. The parties began by stipulating, among other things, that the Bloods owned a home in Stoneridge at Fountain Green that is subject to the Declaration and that they had installed their solar system without seeking approval. They also agreed on, and the court admitted, all of their communications about the solar system. In lieu of in-person testimony from a representative of the Association, the parties stipulated further that Stoneridge at Fountain Green contained 216 homes, that seven other homes had had solar systems installed and all of those homes had solar systems installed entirely on the back roof, not the front.

The parties then presented testimony from two witnesses, Mr. Blood and John Hencken, Vice President of SolarGaines. Mr. Hencken was accepted by the court as a master electrician and an expert in the design and installation of solar rooftop systems. Mr. Blood testified that when he signed the contract to have SolarGaines install his solar collector system, he mistakenly believed that SolarGaines would take responsibility for getting approval from his homeowners' association. He explained that SolarGaines "was not the only company that [he] spoke with about installing a solar collector system . . . [a]nd the two other companies . . . claimed that they would take care of the HOA." He also said that since the solar system has been in place, it has produced more electricity than his house used in the summer and, during the winter months, less electricity than his house needed.

Mr. Hencken testified that requiring the Bloods to remove the front roof solar

5

system would have a significant impact on both its cost and efficiency. He opined that the solar collection system's "efficiency" is synonymous with its "performance" or its ability to convert sunlight into electricity given the "roof space." Based on that reasoning alone, he explained, downsizing the Bloods' solar-viable roof space would reduce the system's overall performance and decrease its efficiency significantly. With regard to cost, Mr. Hencken contrasted a solar collection system priced and designed for forty-eight solar panels with all forty-eight in operation and a solar collection system priced and designed for forty-eight panels, but with fifteen fewer in operation—the latter would use less roof space and an oversized solar inverter, and would cost more per kilowatt-hour generated. In other words, Mr. Hencken opined that the cost of the Bloods' solar collection system would increase significantly because the reduction from forty-eight solar panels to thirty-three meant their solar inverter would be too large to function without wasting power. In his cost evaluation, Mr. Hencken also factored in expenses the Bloods would incur for having the front roof solar panels removed. He concluded that removing the panels would cause a dramatic increase in the solar collector system's cost per kilowatt hour.

The Bloods argued at trial that even though they did not apply to the Association for approval before beginning construction, requiring them to remove fifteen solar panels from their front roof would be an "unreasonable limitation" under RP § 2-119(b)(2). The court disagreed and ruled in favor of the Association. It granted the Association's complaint for declaratory judgment and enjoined the Bloods "from maintaining any solar panels on the front roof of their residence." The Bloods appealed.

6

## II. DISCUSSION

As a matter of general policy, Maryland is, and has for more than fifteen years, been an avowedly pro-renewable energy and pro-solar energy state. The Renewable Portfolio Standard ("RPS"), first passed by the General Assembly in 2004, requires gradually increasing shares of Maryland's electricity supply to come from renewable energy sources and specifically from solar. *See* Md. Code (1998, 2010 Repl. Vol.), § 7-701 *et seq*. of the Public Utilities ("PU") Article. In its original form, the RPS escalated the renewables requirement to 20% overall by 2022, 2% of which had to come from solar energy sources. Over time, these targets have become more and more aggressive; during the 2019 Session, the General Assembly raised them again, effective October 1, 2019, to 50% from renewables overall and 14.5% from solar by 2030. Ch. 757, Acts 2019 (signed May 25, 2019); *see also Board of Cty. Comm'rs of Washington Co. v. Perennial Solar, LLC*, No. 66, Sept. Term 2018, slip op. at 11–17 (Md. July 15, 2019) (charting history of RPS and regulatory framework). The Public Service Commission has promulgated extensive regulations to facilitate the installation of residential solar systems, *see generally* COMAR 20.50.09 (Small Generator Interconnection Standards) and COMAR 20.50.10 (Net Metering), and approved electric company tariffs that allow customers to sell back to their company any solar electricity they generate but aren't using.[2] Indeed, the Commission's regulations specifically allow customers to build solar systems that can generate twice as

---

[2] *See, e.g.*, Baltimore Gas and Electric Company Electric Retail Tariff, Rider 18, P.S.C. Md. – E-6 (Suppl. 490), available at
https://www.bge.com/MyAccount/MyBillUsage/Documents/Electric/Rdr_18.pdf

much as they use. COMAR 20.50.10.01D(1)(b) ("The eligible customer-generator's proposed electric generating system may not exceed 200 percent of the eligible customer-generator's baseline annual usage.").

It is against this backdrop that we consider the Bloods' challenge to the declaratory judgment and injunction entered by the circuit court. The statute at issue here was passed in 2008, the same year the RPS was first expanded, and was designed to reduce another potential barrier to solar installations: unreasonable restrictions by homeowners' associations. The Bloods seek specifically to raise two questions:[3] (1) whether—under RP § 2-119(b)—the trial court improperly enforced the Association's direction that they remove the solar collection system from the front roof of their house; and (2) whether the Association was required to provide a reason for denying the Bloods' initial application (and subsequent appeal) to allow the system.

We review declaratory judgments for clear error. *See Shader v. Hampton Improvement Ass'n, Inc.*, 217 Md. App. 581, 617 (2014); Md. Rule 8-131(c). But where a court's decision "involves an interpretation and application of Maryland constitutional,

---

[3] The Bloods listed the following Questions Presented in their brief:

> 1. Did the Circuit Court properly interpret the Solar Statute where it concluded that the HOA's requirement that the Bloods remove all of the solar panels from the front roof of their Property is not an unreasonable limitation on the installation of a solar collector system?

> 2. Should the Circuit Court have found that the HOA's denial of the Bloods' application is unreasonable when the HOA provides no reason or justification for the denial?

statutory or case law, [we] must determine whether the trial court's conclusions are 'legally correct' under a *de novo* standard of review." *Schisler v. State*, 394 Md. 519, 535 (2006) (*quoting Garfink v. Cloisters at Charles, Inc.*, 392 Md. 374, 383 (2006)).

## A.    The Association's Limitation Of Solar Panels On the Bloods' Front Roof Is Not Unreasonable.

We start by defining the decision we are reviewing (which matters as well for the Bloods' second question). The Association brought this case. It sought declaratory and injunctive relief to enforce its rear-roof-only policy against the Bloods and require them to remove the solar panels from the front roof of their house. The essential underpinnings of this dispute aren't contested: the Bloods agree that they are bound by the Declaration; that they failed to seek approval before undertaking installation of their solar system; that the Association's architectural review committee denied their eventual application; that the Association Board denied their appeal; and that they have not removed the panels. The Bloods don't challenge the Association's authority to enforce the Declaration generally, nor do they dispute that there are seven other houses in the development with solar panels, all of which are installed only on the rear roof.

Instead, they argue that restricting solar panels to their front roof is an "unreasonable limitation" barred by RP § 2-119(b). This limitation is unreasonable, they say, because it reduces the size and generating capacity of their system (from forty-eight panels to thirty-three), making it less efficient without reducing the cost. *See* RP § 2-119(b)(2). Indeed, they claim, requiring them to remove the panels will add cost they otherwise wouldn't bear. The Association replies that the trial court "properly applied the statute" and found

9

correctly that "there is no evidence of a *significant* increase in cost or a *significant* decrease in efficiency." We agree with the Association that this limitation isn't unreasonable. The Association's aesthetic and scale limitation does not impair the system's efficiency or increase its cost significantly. And to the extent the Bloods will incur removal costs and receive less revenue from a system that complies than they would from a full forty-eight panel system, their wounds are self-inflicted.

"The cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature." *Maloof v. State of Md., Dep't of the Env't*, 136 Md. App. 682, 700 (2001) (cleaned up). We look first to the plain language of the statute and decide what parts, if any, are "ambiguous or not clearly consistent with the statute's apparent purpose." *Hailes v. State*, 442 Md. 488, 495 (2015). If there is no ambiguity, "our inquiry as to the legislative intent ends [] and we apply the statute as written," viewing it in the context of its own statutory scheme and in harmony with the statute's overall object and scope. *Gardner v. State*, 420 Md. 1, 9 (2011) (*quoting State v. Johnson*, 415 Md. 413, 421–22 (2010)).

Real Property Article § 2-119 defines a "solar collector system" as "a solar collector or other solar energy device, the primary purpose of which is to provide for the collection, storage, and distribution of solar energy for electricity generation, space heating, space cooling, or water heating." RP § 2-119(a)(3). Subsection (b) prohibits restrictions on land use that "impose or act to impose unreasonable limitations on the installation of a solar collector system," and defines "unreasonable" to "includ[e] a limitation that [] [s]ignificantly increases the *cost* of the solar collector system; or [s]ignificantly decreases

10

the *efficiency* of the solar collector system." RP § 2-119(b)(1)–(2) (emphasis added). The statute doesn't provide any further definition of "cost" or "efficiency," nor examples of restrictions that are and aren't permissible.

Even so, this language is not ambiguous. Cost is a straightforward concept, and the record contains no evidence that restricting solar installations to the rear roof of a home increases the cost of a system or that the relationship of size to cost is anything but linear. Efficiency is also a straightforward concept, but the Bloods' expert, Mr. Hencken, conflated it with scale. He testified that the solar industry views efficiency in terms of "the amount of sunlight we can take, given his roof space, and convert that into electricity." And of course it's true that a greater number of panels will produce more kilowatt-hours of electricity and, through net metering, generate more potential revenue for the Bloods. But reducing the size of the array doesn't make the system operate less efficiently, and Mr. Hencken never said it did. It's simply a matter of scale—a bigger array generates more electricity than a smaller one, but there was no evidence that the bigger or smaller systems operate any differently. To the extent that the Bloods bought equipment sized for a forty-eight panel array that won't be used to capacity by thirty-three panels, that "inefficiency" was created by the Bloods' failure to clear the project before installation, not the restriction itself. So too for the additional cost of removing panels from the front roof that would never have been installed had the Bloods complied with the Declaration.

We could stop there, but we also have reviewed § 2-119's legislative history, and it bolsters our conclusion about the validity of this particular restriction. The bill file for RP § 2-119 confirms the legislation's overall purpose to "encourage[] installation of

11

residential solar energy systems." Testimony of Delegate C. Sue Hecht (the bill's sponsor in the House); *see also* Floor Report at 2 ("[t]he General Assembly [] enacted statutory language stating that it is in the public interest to promote solar energy projects" and that it has done so "by providing State grants, loans, and other financial assistance" to incentivize "solar energy production and consumption."). The legislators also were aware of a trend in homeowners' associations elsewhere to reject solar projects and the response of "at least two states [passing] laws [to prohibit] such vetoes." Felicity Barringer, *In Many Communities, It's Not Easy Going Green*, N.Y. Times (Feb. 7, 2008), https://www.nytimes.com/2008/02/07/us/07green.html. The bill's notion of reasonableness evolved over time, though—the original draft contained additional examples of "unreasonable limitations" that were later deleted, including limitations that "[s]ignificantly decrease[] the specified performance of the system; or [do] not allow for an alternative system of comparable cost, efficiency, and energy conservation benefits." We can see from this history that the legislature balked at equating efficiency and performance in precisely the manner the Bloods advocate here, a reading that is inconsistent with the words' plain meaning in any event.

The Bloods' reading of § 2-119, and particularly their conception of efficiency, would effectively preclude homeowners' associations from restricting solar installations at all. As they would have us interpret the statute, an installation smaller than the maximum possible size would have suffered a significant reduction in efficiency and increase in cost (not to mention a reduction in potential net metering revenue). But the statute can't be as cryptic as the Bloods suggest because the General Assembly didn't intend it that way.

Section 2-119 expressly allows homeowners' associations to impose reasonable limitations, and regardless of whether we agree with the Association's aesthetic judgment, we cannot say that a policy of restricting solar panel systems to the rear roofs of houses necessarily is unreasonable. The policy still allows members to install solar—in this case, more than two-thirds of the size the Bloods wanted to install—and places no discernible restriction on the components or operation of the system. We can imagine other restrictions that readily could run afoul of § 2-119—for example, requiring inverters or meters or other equipment to be hidden or installed in difficult or expensive places, or perhaps limiting solar panels to a particular roof area when that location renders the solar system economically untenable or unreasonably inefficient. But those kinds of restrictions aren't at issue here.

The record reveals that the Association allows solar on rear-facing roofs, has applied that policy to at least seven other houses in the development, and seeks only to apply that same limitation to the Bloods even though they failed to seek approval before installing their system. We agree with the circuit court that the Association was entitled to declaratory and injunctive relief, and we affirm the judgment.

### B. The Association Acted Reasonably In Enforcing The Restriction.

Article V of the Declaration requires that a property's exterior additions, changes, or alterations must be "submitted to [the Association] and approved in writing [and]. . . approval shall not be unreasonably withheld." In their closing argument at trial, the Bloods contended that "[b]y providing no reason for a denial, [Stoneridge HOA] unreasonably withheld its approval of the application in violation of its own Declaration." We can

13

reproduce the entire argument here:

> **[Counsel for the Bloods]:** [The Association] [] denied – there's no dispute that they denied the application. There's no dispute that they gave no reason for the denial. There are letters that are submitted on Exhibit 20 of the plaintiff, where it indicates that my client is to remove the solar system, everything. Doesn't say just the front. It says remove everything. So you have a denial without any reason. How could that be a reasonable reason if there's no reason whatsoever.

In other words, the Bloods argued that because the Association lacked an explicit reason for denying their request, the denial is *per se* unreasonable. But they backed up this theory with no authority, and the circuit court didn't address it.

In their opening brief, the Bloods say, in a paragraph bereft of citation, that the language of Declaration V required the Association to provide a reason for denying their application; they repeat the point at slightly greater length in their reply. This argument misapprehends the posture of the case and our task on appeal. Neither the circuit court nor we are reviewing the Association's decision—the Association is not a trial court or administrative agency. The Association is, well, an association, and "[t]he general rule under Maryland law is that decisions made by a homeowners association's board of directors will not be disturbed unless there is a showing of fraud or bad faith." *Rainer v. Ehrlich*, 212 Md. App. 142, 155 (2013) (*citing Black v. Fox Hills North Cmty Ass'n*, 90 Md. App. 75, 82 (1992)). The Association was the plaintiff in the circuit court, and both that court and we evaluate whether the Association was entitled to enforce the rear-roof restriction against the Bloods. The Association's compliance or not with any rules of procedure is not before us, nor have the Bloods alleged fraud or bad faith. To the contrary,

the facts to which the Bloods stipulated in the circuit court establish that the Association sought here to enforce a limitation consistently. And because, as we now have confirmed, the restriction is reasonable for purposes of RP § 2-119, the Association could not have been acting fraudulently or in bad faith by enforcing the restriction as it did.

**JUDGMENT OF THE CIRCUIT COURT FOR HARFORD COUNTY AFFIRMED. APPELLANT TO PAY COSTS.**